J. S. DEERING, appellee, v. DEAN J. BARNEY, appellant.

No. 47557.

(Reported in 41 N.W. 2d 57)

FEBRUARY 7, 1950.

REHEARING DENIED APRIL 7, 1950.

John D. Beardsley, of Onawa, and B. H. Morrison, of Mapleton, for appellant.

Prichard & Prichard, of Onawa, for appellee.

WENNERSTRUM, J.—The plaintiff, a physician and surgeon, sought in an equity action to determine his rights under a written agreement wherein the defendant purportedly agreed to pay the plaintiff for professional services rendered to an uncle and the defendant. The district court held that under the agreement in issue defendant was obligated to pay the amount of the accounts claimed due. He has appealed.

Fred Jewell, appellant's uncle, had been a patient of appellee in his hospital in Onawa on numerous occasions. His account had been paid up to and including July 16, 1946. The account in controversy covered professional and hospital services rendered from the date previously mentioned to May 29, 1947, the date of Fred Jewell's death. Evidence was introduced that the amount of the uncle's account, after allowing a credit of $245, totaled $2607.74. Also involved in the controversy was appellant's personal account of $150 for an appendectomy previously performed by the appellee for appellant. The total amount of the two accounts was $2757.74.

Prior to May 24, 1945 Fred Jewell was the owner of the farm involved in this litigation. On that date he deeded it to his sister, May C. Barney, mother of appellant with whom he had been living. Dean J. Barney, the son, was then the tenant on the farm, consisting of two hundred ten acres.

Appellant's mother died on November 9, 1946 leaving a will which was admitted to probate on December 9, 1946. Robert M. Underhill, an attorney in Onawa, was named executor. The will gave to the appellant a life estate in the farm occupied by him. In March 1947 the appellee learned of the deeding of the farm by Fred Jewell to his sister, May C. Barney, and of the then interest the appellant had in it as a life tenant. Appellee and appellant had several conversations relative to the account of Fred Jewell, the personal account of appellant with appellee, and the possibility of an action being brought by appellee to set aside the deed given by Jewell to his sister, appellant's mother. In connection with the appellee's testimony it is shown that in one of his conversations with the appellant, Doctor Deering stated that one of Fred Jewell's relatives had conferred with him in regard to Jewell's mental condition and the deeding of

the farm to appellant's mother. The appellee's testimony, in part, is as follows:

"A. And I approached Dean then and told him if that instrument was allowed to go on I would be holding the sack, there would be nobody to pay the bill and that the family wanted me to help overthrow the will and that I thought when that was executed he was mentally incompetent and that I felt I would have to go along with the family; I said I wasn't interested either way how the estate went, I was interested in seeing that the bill was ultimately taken care of. Dean said, 'I don't have the money.' I said, 'I don't care if you don't have the money, if you will draw up so that ultimately the hospital bill will be taken care of that will be satisfactory.' Well, he said he would try and work out something. I might have mentioned it to him a time or two but I don't remember seeing him again until he brought this in and said would that be satisfactory."

Further testimony of the appellee concerning his contemplated action to set aside the deed is, in part, as follows:

"Q. Doctor, there has been some testimony here that you told the defendant that you intended to go ahead with some action to set aside the deed that had been given by Mr. Jewell to Mrs. Barney if some arrangements were not made in regard to your account. You may state to the court as to whether or not you actually intended at the time you made those statements to go ahead with such an action unless some settlement of the account was made. A. I certainly did. * * * I happened to hear about this deed when Mrs. Fred Warner came in and wanted to start action against the will, a month or two after May Barney died. Mrs. Warner was a niece of Fred Jewell who was a single man at the time of his death and would be interested in the matter as an heir. It was about that time that I had my first talk with Dean, and it was at that time that I told him that I would be holding the sack for Fred Jewell unless somebody paid. I told Dean I thought he should pay it or agree to pay it. I felt as he was inheriting the property, Fred Jewell's property, that he should be responsible because Fred himself would have paid any bill he ever owed. I thought that Dean's obligation to pay Fred Jewell's debt was because Dean had inherited

through his mother the property that had previously been Fred Jewell's. I told Dean at that time that I was going to bring action to set aside the deed and also talked to Robert Underhill, as the attorney for the estate. I was anxious to see that this quite considerable bill was paid by somebody. I was deeply concerned about it. I had several conversations prior to the date that Dean went to Underhill's office and had this contract drawn up. I was not present that morning in Underhill's office. I don't remember the exact details. I may have called Robert Underhill that morning and told him and Dean to go ahead and draw something up, that I had an operation and they could bring it up later. In any event Exhibit B was drawn up and brought to me at the hospital. It was accepted by me with the addition of that notation regarding the interest that I put on."

The evidence shows that the agreement in issue, Exhibit B in the record, was prepared by Robert Underhill, the executor of the estate. Doctor Deering was not present when it was prepared. It was later presented to him and had been signed by appellant before that time or at the time of its delivery. It was accepted by the appellee as written with the exception that there was to be a notation added as to interest. This agreement is as follows:

"THIS INDENTURE, WITNESSETH:

"That Dean J. Barney of Onawa, Iowa, for the purpose of securing the payment of all reasonable and proper expenses for keep of Fred F. Jewell while he is a patient in the Onawa Hospital, and for all reasonable and proper items of charge of Dr. J. S. Deering as physician and surgeon for said Fred F. Jewell, and for any agreed charge of Dr. J. S. Deering for services rendered by him on account of an appendectomy performed by Dr. J. S. Deering for Dean J. Barney, does hereby agree to pay and turn over to Dr. J. S. Deering a sum equivalent to a one-half share of all corn, and a two-fifths share of all small grain and soy beans, raised by Dean J. Barney on certain lands hereinafter described, subject to the following conditions and in the following time and manner, to-wit:

"1. Before computing the sum equivalent to the crop shares hereinabove mentioned, the amount of property and income taxes,

crop and property insurance and reasonable upkeep of fences and buildings incurred by Dean J. Barney in connection with the current operation of said farms, shall be deducted from the gross receipts from said farms.

"2. Said sums shall be paid to Dr. J. S. Deering at such times as Dean J. Barney shall market and sell said crops, and such payments shall be made out of crops raised and sold in the year 1947 and subsequent years until the full amount of said obligations of Fred F. Jewell and Dean J. Barney to Dr. J. S. Deering are paid.

"3. It is expressly understood and agreed that in the event Dean J. Barney should not acquire, or should be denied, ownership of said farms from and through May C. Barney, deceased, through litigation or action of whatsoever kind instituted by others, then this contract shall be null and void.

"4. ❋ ❋ ❋

"5. Said obligations of Fred F. Jewell and Dean J. Barney to Dr. J. S. Deering shall not bear interest unless default be made in the payments mentioned in this contract. 4% on Fred's account.

"Witness my hand this 17th day of May, 1947. s/Dean J. Barney."

This agreement was acknowledged by Dean J. Barney before Robert M. Underhill, a notary public.

I. It is appellant's claim that the agreement was not supported by a valid and legal consideration. The basis for this contention is that part of the appellee's testimony heretofore set out where he testified that a relative had conferred with him in regard to the mental condition of Fred Jewell. His testimony as to this fact was:

"❋ ❋ ❋ and that the family wanted me to help overthrow the will and that I thought when that was executed he was mentally incompetent and that I felt I would have to go along with the family; I said I wasn't interested either way how the estate went, I was interested in seeing that the bill was ultimately taken care of."

It will be observed in this last quoted testimony that the witness referred to a will. He must have had in mind the deed

given by Jewell to appellant's mother. It is the claim of appellant that under our prior holdings there is no valid consideration for the agreement in that he contends the appellee would testify in any action brought by the relative in a way detrimental to appellant's interest if appellee's account was not secured. Cole v. Brown-Hurley Hardware Co., 139 Iowa 487, 490, 117 N.W. 746, 18 L. R. A., N. S., 1161, 16 Ann. Cas. 846; Rosenbaum Bros. v. Levitt, 109 Iowa 292, 296, 80 N.W. 393. We are unable to put the construction on this testimony which appellant seeks to do. The appellee does not state that he would testify falsely if the appellant did not secure the accounts. It would be the giving of false testimony or the threatening to give false testimony that might have vitiated the agreement. It is also well to consider the appellant's version of the conversations he had with the appellee. He testified, in part, as follows:

"The only conversation I can remember at this time between Doc and I as far as the deed of the place was concerned, he had asked who was going to pay the bill, Fred's bill. At that time the old man was still alive, and I can't remember of only twice of ever talking to Dr. Deering about it. He asked who was going to pay Fred's bill. I can't remember just what I did tell him. I didn't know. Of course, at that time I didn't know much about Fred's business and didn't know how much of a bill there was and we were supposed to talk it over and decide on some way that it should be. He talked to me at his office one time, just mentioned it. There wasn't a whole lot ever said only Doc would always say: 'I am sure you and I can come to some kind of an agreement', and that was all that was really said in our conversation. Q. Did doctor threaten to you that he was going to start proceedings to set aside that deed? A. Well, he had mentioned that there could be something done about it. Of course he did mention that he could say that the old man was out of his mind when he had signed this deed over to my mother. * * * Dr. Deering didn't come to the meeting at Bob Underhill's office. At the last minute he called and there was something he had on that he couldn't make it and he said that anything that we fixed up would be all right with him, to bring it down. So Bob and I sat there and tried to arrange on something that would be satisfactory. After we had it fixed, I took it to Doc's and

Doc signed it, or I had signed it and took it down and Doc opened it and read it and said that would be all right but he wanted 4% interest. I folded my contract and stuck it in my pocket and didn't have the 4% put on mine, and it isn't on my contract, but he said 4% would have to go on and that is all that was said as far as I was concerned. Prior to this date I hadn't had any conversation with Dr. Deering specifically about the terms that were to go into this thing. The plan was worked out by me and Bob Underhill, my attorney. * * * Q. You intended at the time that Exhibit B was drawn and turned over by you to Dr. Deering to give him an instrument which could be enforced to the amount of the reasonable and proper items of charge that he had as against Fred Jewell or that he would have in the future as against Fred Jewell and the reasonable charge for an appendectomy that he had performed for you, is that not correct? A. Yes."

II. The appellant does not even indicate that the appellee had stated that he would testify falsely. Then, too, it is a significant fact that the agreement was prepared alone by the appellant and his attorney. There is ample testimony that the appellee had stated that he had contemplated bringing an action to set aside the deed. The forbearance to bring such an action is ample consideration for the agreement. Wright v. Iowa Southern Utilities Co., 230 Iowa 838, 841, 842, 298 N.W. 790; Burke v. Dillin, 92 Iowa 557, 562, 61 N.W. 370; Heflen v. Brown, 208 Iowa 325, 329, 223 N.W. 763; Urdangen v. Fryer, 183 Iowa 39, 41, 166 N.W. 693.

III. The appellee has argued that the matter of the invalidity of the agreement was not raised in the trial court and cannot be presented as a ground for reversal now in this court. We do not deem it necessary to pass upon this question preferring to determine this case upon the issues and facts set out in Division I hereof.

We have considered all matters presented and have concluded that the trial court was correct in its findings and conclusions of law and in the decree entered. We therefore affirm.— Affirmed.

All JUSTICES concur.